503 P.3d 951
 The PEOPLE of the State of Colorado, Complainant,
v.
Douglas Leo ROMERO, #35464, Respondent.
 Case Number: 20PDJ067
 Office of Presiding Disciplinary Judge of the Supreme Court of Colorado.
 November 23, 2021
March 3, 2022
 
 
 

 
 
 503 P.3d 955
 
 
 AMENDED OPINION AND DECISION IMPOSING SANCTIONS UNDER C.R.C.P. 251.19(b)[1] 
 Douglas Leo Romero ("Respondent") technically converted his client's funds when he failed to maintain an adequate recordkeeping system for his trust accounts. As a result, the funds in his trust accounts dipped well below the amount he should have been holding for his client. Given Respondent's extensive prior discipline, this misconduct warrants a two-year suspension, to run concurrently with a three-year suspension he is currently serving in another disciplinary case. As part of any petition for reinstatement, Respondent will be required to achieve a passing score on the multistate professional responsibility exam.
 
 I. PROCEDURAL HISTORY 
 
 On October 29, 2020, Justin P. Moore of the Office of Attorney Regulation Counsel ("the People") filed a complaint against Respondent with Presiding Disciplinary Judge William R. Lucero ("the PDJ"), alleging violations of Colo. RPC 1.15A(c) (Claim I), Colo. RPC 1.15D (Claim II), and Colo. RPC 8.4(c) (Claim III). Respondent answered the complaint on November 24, 2020, and the PDJ set a three-day hearing for June 2021, which was later continued at the People's request for October 6-8, 2021.
 On April 21, 2021, the People filed an amended partial summary judgment motion on Claims I and II of the complaint. After a full suite of briefing, the PDJ granted the motion for partial summary judgment and entered judgment on both claims. On September 10, 2021, the People moved without opposition to dismiss Claim III and to convert the hearing in this case to a one-day hearing on the sanctions. The PDJ granted that motion on September 13, 2021, and set the one-day hearing for October 6, 2021.
 On October 6, 2021, a Hearing Board comprising the PDJ and lawyers Lucy Hojo Denson and David R. Struthers held a remote hearing on the sanctions under C.R.C.P. 251.18 via the Zoom videoconferencing platform. Moore represented the People, and Respondent appeared with his counsel, Gerald D. Pratt. The Hearing Board heard the testimony of Mayra Dubon, who testified with the assistance of a Spanish-language interpreter; Christina Cullers; James Sudler; Marisela Mendoza; and Respondent. The Hearing Board also considered stipulated exhibits S1-S11.
 
 II. FACTUAL FINDINGS AND RULE VIOLATIONS 
 
 Respondent was admitted to practice law in Colorado on May 24, 2004, under attorney registration number 35464.[2] He is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in this disciplinary proceeding.
 
 Facts Established on Summary Judgment
 
 Between 2018 and August 2019, Respondent practiced law through his law firm, Douglas L. Romero Attorney at Law, LLC, d/b/a Colorado Christian Defense Counsel ("CCDC"). CCDC operated two trust accounts through First Bank, both under the account name Douglas L. Romero Attorney at Law, LLC.[3] CCDC maintained no other trust accounts between August 2018 and December 2019. The last four digits of one account were 7150 ("COLTAF 7150") and the last four digits of the second account were 7169 ("COLTAF 7169").[4] Between 2018 and 2019, the funds in these two trust accounts were held for clients or third parties.
 In February 2018, Mayra Dubon met with Respondent, seeking his assistance with certain 
 
 
 503 P.3d 956
 
 
 legal matters.[5] Dubon's sister, Karla, had passed away, and Dubon had been designated as the legal guardian for Karla's two minor children, whom Dubon brought to Colorado.[6] In 2018, Dubon and Respondent entered into an agreement providing that Respondent would assist her to seek appointment as conservator for the children and obtain benefits owed to them from life insurance policies and from Karla's employer, Key West Boats. Karla had two life insurance policies, including one from Guardian Life Insurance. She also had participated in an employee stock option program through Key West Boats. Karla's children were designated as beneficiaries on the life insurance policies and the employee stock plan.[7] 
 During the representation, Respondent secured funds for the benefit of the Dubon children. In August 2018, Respondent received from Guardian Life Insurance two checks for $6,666.67 each and two checks for $3,807.99 each. These four checks totaling $20,949.32 were deposited into COLTAF 7169.[8] In August 2019, Respondent received a check from Key West Boats in the amount of $3,387.20. This check was deposited into COLTAF 7150.[9] 
 On July 17, 2019, Respondent filed a "Petition to Settle the Estate, Request to Deposit Monies with Court Registry, Request to Approve Counsels’ [sic] Fee's [sic] and Costs and Motion to Withdraw," in which he stated, "The amounts which remain for the estate are in the COLTAF Account of Counsel."[10] Respondent also asked the court to direct how the funds in the estate should be distributed. He attached a document to the petition titled "Financial Statement of Dubon Estate."[11] The financial statement listed the following:
 • Settlement for Guardian Insurance = two checks received for $6,666.67 and two checks for $3,807.99.
• Settlement for Guardian Stock (ESOP) = $3,387.20.
• Attorney fees and costs = $6,156.33 ($6,084.13 in attorney's fees with additional related costs of $72.20).
• Amounts paid to the Myra Dubon [sic] Expenses of the Estate/Burial and Installment of Key West ESOP = $7,540.40.
• Total Remaining to be paid by the Estate held in Trust = $16,796.12.
• Financial Amounts Yet to be Recovered by the Estate = $63,548.82.[12] 
 As of July 17, 2019, the amount to be held in trust for the benefit of the Dubon children should have been $16,078.39.[13] Likewise, this same amount should have remained in trust between July and December 2019. No documents show any transfer of funds related to the Dubon matter between COLTAF 7169 and COLTAF 7150.
 According to First Bank statements, between July and December 2019 the daily balance of COLTAF 7169 was as follows:
 
 
 503 P.3d 957
 
 
 
 
 
 
 Date
 
 
 Balance
 
 
 
 7/12/2019
 $37,332.27
 
 
 7/15/2019
 $6,699.77
 
 
 7/16/2019
 $10,199.77
 
 
 7/18/2019
 $10,344.96
 
 
 7/19/2019
 $8,844.96
 
 
 7/22/2019
 $10,364.96
 
 
 7/24/2019
 $8,837.17
 
 
 7/25/2019
 $6,837.17
 
 
 7/26/2019
 $4,834.67
 
 
 7/31/2019
 $9,822.17
 
 
 8/1/2019
 $9,822.17
 
 
 8/2/2019
 $10,620.17
 
 
 8/5/2019
 $7,480.17
 
 
 8/6/2019
 $7,729.54
 
 
 8/8/2019
 $7,978.91
 
 
 8/9/2019
 $4,478.91
 
 
 8/12/2019
 $5,675.16
 
 
 8/16/2019
 $6,672.66
 
 
 8/19/2019
 $8,867.16
 
 
 8/26/2019
 $9,864.66
 
 
 8/27/2019
 $9,064.66
 
 
 8/28/2019
 $5,264.66
 
 
 8/30/2019
 $5,264.66
 
 
 9/3/2019
 $4,939.66
 
 
 9/9/2019
 $5,939.66
 
 
 9/10/2019
 $5,739.66
 
 
 9/17/2019
 $5,239.66
 
 
 9/18/2019
 $4,239.66
 
 
 9/27/2019
 $4,039.66
 
 
 9/30/2019
 $3,839.66
 
 
 10/1/2019
 $3,839.66
 
 
 10/4/2019
 $3,299.66
 
 
 10/8/2019
 $2,799.66
 
 
 10/9/2019
 $22,962.63
 
 
 10/10/2019
 $2,962.63
 
 
 10/11/2019
 $27,462.63
 
 
 10/15/2019
 $2,462.63
 
 
 10/16/2019
 $1,462.63
 
 
 10/17/2019
 $2,962.63
 
 
 10/18/2019
 $1,162.63
 
 
 10/21/2019
 $768.13
 
 
 10/29/2019
 $2,768.13
 
 
 10/31/2019
 $2,768.13
 
 
 11/1/2019
 $2,768.13
 
 
 11/12/2019
 $2,765.13
 
 
 11/13/2019
 $1,765.13
 
 
 11/19/2019
 $1,765.13
 
 
 11/25/2019
 $7,151.35
 
 
 11/26/2019
 $5,151.35
 
 
 11/29/2019
 $4,851.35
 
 
 12/2/2019
 $3,695.63
 
 
 12/3/2019
 $3,495.63
 
 
 12/5/2019
 $3,483.63
 
 
 12/6/2019
 $3,981.63
 
 
 12/10/2019
 $3,230.63
 
 
 12/11/2019
 $3,429.83
 
 
 
 
 
 
 503 P.3d 958
 
 
 The lowest combined balance of Respondent's two trust accounts in July and August 2019 was $21,821.33 on August 16, 2019.[14] The combined balance of the two accounts during July and August 2019 was always greater than $16,078.39. On November 29, 2019, the combined balance of the two trust accounts was $6,413.29. On December 2, 2019, the combined balance of these accounts was $5,257.57.
 On September 3, 2019, Respondent was suspended from the practice of law for three years in case number 18PDJ063 (consolidated with case number 19PDJ042).[15] This suspension, which ran concurrently with his suspension in case number 16PDJ057, took effect on August 27, 2019.[16] 
 According to First Bank records, between August 2019 and October 2019, Respondent was the only lawyer with signatory authority over COLTAF 7169. On October 2, 2019, lawyer Jean Pirzadeh was added as a signer to COLTAF 7169. Two days later, staff member Amanda P. Cisneros Lopez was also added as a signer to that account. Respondent was also the only lawyer with signatory authority over COLTAF 7150 until August 5, 2020, when Pirzadeh and Cisneros Lopez were added as signers to that account.
 On December 28, 2019, Pirzadeh filed an amended petition to settle the estate in the Dubon matter. In that filing, she advised the court that Respondent's license had been suspended, that she had inherited the Dubon case, and that all benefits that had been obtained "remain[ed] intact in the COLTAF trust account."[17] 
 In December 2019, after discovering a deficiency in the trust accounts, CPA Christina Cullers raised concerns during a conversation with Respondent.[18] No one else was present for that conversation. On December 19, 2019, Respondent wrote a check for $34,100.00 from his firm's operating account to cover the shortage in the trust accounts.[19] 
 As described in more detail below, Respondent retained the following financial information related to the Dubon funds: the financial statement filed with the underlying court; the amended petition filed to settle the Dubon estate; copies of the checks received from Guardian Life Insurance and the corresponding deposit slip for COLTAF 7169; the check from Key West Boats and the corresponding deposit slip for COLTAF 7150; and copies of four checks written to Dubon from COLTAF 7169. Respondent also provided the People with reconciliations of the two trust accounts before his deposition in May 2021. Respondent did not maintain any document titled "ledger" in the Dubon matter.
 In April 2021, Respondent's counsel gave the People copies of the four checks written to Dubon from COLTAF 7169: (1) check number 1186, dated August 15, 2018, for $2,000.00; (2) check number 1248, dated December 14, 2018, for $2,000.00; (3) check number 1121, dated January 8, 2019, for $1,000.00; and (4) check number 1211, dated March 31, 2019, for $2,258.13.[20] These four checks totaled $7,258.13.[21] This amount is different from the $7,540.40 figure reflected in the financial statement Respondent filed with the court.[22] Respondent's firm thus should have held in trust $282.27 more than what was reflected in the financial statement.
 As discussed above, Respondent's counsel also gave the People documents said to be reconciliations of Respondent's two trust accounts for the period of July 2018 to May 2019. These reconciliations do not contain COLTAF account numbers. The reconciliations reflect the following transactions related to the Dubon matter:
 
 
 503 P.3d 959
 
 
 • Payment $17,141.33 to CCDC (August 1, 2018) ("Mrya [sic] Dubon - Received from Guardian/ESOP/Myra Dubon Insurance and company settlement");
• Payment $3,807.99 to CCDC (August 14, 2018);
• Payment $2,000 to Ms. Dubon (August 24, 2018);
• Payment $2,000 to Ms. Dubon (December 20, 2018);
• Payment $1,000 to CCDC (January 22, 2019);
• Payment $1,000 to Ms. Dubon (February 20, 2019);
• Payment $3,387.20 to CCDC (March 18, 2019); and
• Payment $2,258.13 to Ms. Dubon (April 3, 2019).[23] 
 The reconciliations also show that the following amounts should have been safeguarded for the benefit of the Dubon children:
 • September 2018 - $22,336.52;
• October 2018 - $22,336.52;
• November 2018 - $18,949.32;
• December 2018 - $16,949.32;
• January 2019 - $17,949.32;
• February 2019 - $16,949.32;
• March 2019 - $20,336.52;
• April 2019 - $18,078.39;
• May 2019 - $18,078.39;
• June 2019 - $18,078.39; and
• July 2019 - $18,078.39.[24] 
 
 Rule Violations
 
 On summary judgment, the PDJ concluded as a matter of law that Respondent violated Colo. RPC 1.15A(a) and Colo. RPC 1.15D.
 The PDJ determined that Respondent failed to comply with Colo. RPC 1.15A(a), which requires a lawyer to hold property of clients and third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property. The PDJ ruled that Respondent violated Colo. RPC 1.15A(a) by failing to safeguard $16,078.39 of the Dubon children's funds that had been deposited into COLTAF 7169. The PDJ reasoned that Respondent received $20,949.32 from Guardian Life Insurance for the benefit of the Dubon children, that those funds were deposited into COLTAF 7169 in August 2018, and that after disbursements made to Dubon, Respondent should have been holding $16,078.39 in trust for the benefit of the Dubon children between July and December 2019.
 Because no documentation exists showing a transfer of any of the Dubon funds from COLTAF 7169 to COLTAF 7150, the PDJ concluded that the $16,078.39 should have remained in COLTAF 7169. But the balance of COLTAF 7169 in July 2019 was far below what should have been safeguarded, the PDJ found.[25] The PDJ also determined that the balance of COLTAF 7169 was less than $16,078.39 on several other occasions before Respondent's suspension took effect in late August 2019, less than $16,078.39 before October 2, 2019, when Pirzadeh was given signatory authority on the account, and far less than $16,078.39 between October 2 and December 11, 2019. The PDJ thus found that Respondent violated Colo. RPC 1.15A(a) by allowing the balance of COLTAF 7169 to fall below the sum he should have held in trust for the Dubon children, resulting in a technical conversion of a portion of the Dubon funds.
 The PDJ rejected several defenses Respondent raised. The PDJ ruled that the People need not prove that Respondent transferred funds from the trust account into his operating account or that he spent the funds for his own personal use. Further, the PDJ found unavailing Respondent's argument that he did not convert funds because the combined balances in his two trust accounts were sufficient to cover the amount held for the Dubon children. The PDJ reasoned that the undisputed material facts 
 
 
 503 P.3d 960
 
 
 demonstrate that $16,078.39 should have remained in COLTAF 7169, as no evidence shows those funds were ever transferred into the other trust account. The PDJ also noted that the combined balance of Respondent's two trust accounts fell below $16,078.39 between November and December 2019. Finally, the PDJ declined to adopt Respondent's argument that he could not be held accountable for deficiencies in the trust accounts after August 2019, when he delegated supervision over the trust accounts to Pirzadeh.
 The PDJ also concluded that Respondent had violated Colo. RPC 1.15D, which requires a lawyer to maintain in a current status for seven years an appropriate recordkeeping system identifying each separate person for whom the lawyer or the law firm holds funds or other property. The PDJ held that Respondent failed to maintain an adequate ledger or a current recordkeeping system for each trust account that appropriately tracked the location of the Dubon funds between July and December 2019.
 
 Facts Established at Hearing on the Sanctions
 
 Factual findings in this section are drawn from the testimony at the hearing on the sanctions where not otherwise indicated. The Hearing Board considers the testimony and exhibits for the limited purpose of determining the appropriate sanction to be imposed in this matter.
 Respondent grew up in the Denver area, working in his family's restaurant before enrolling in law school. He was admitted to practice law in 2004. After briefly working first for the district attorney in drug court and then for a solo practitioner, he opened his own firm in 2005. For Respondent, the "point of being a lawyer [wa]sn't profit." Instead, motivated in part by his religious faith, he aimed to help his low-income clientele with their immigration, criminal, personal injury, and probate matters.
 In late 2016, Respondent was suspended from the practice of law for one year, with five months served and seven months stayed upon successful completion of a three-year period of probation with conditions, including attending and passing a one-day ethics school, attending and passing a one-half-day trust account school, undergoing a financial audit, and abiding by practice monitoring conditions.[26] The suspension took effect on February 1, 2017; Respondent was reinstated to the practice of law and began serving his three-year probationary period on October 1, 2017.[27] 
 James Sudler served as Respondent's probationary practice monitor from approximately early 2018 through November 2019. Sudler completed an initial audit of CCDC, save for an audit of the firm's trust account, which Cullers performed. According to Respondent, "everything came out correct" from the trust account audit, although he conceded that the audit revealed some accounts had been neglected and thus were not accurate. Cullers explained that after she audited CCDC's trust accounts, she spent several hours in late 2018 training Respondent's five- or six-person staff in properly separating, tracking, and maintaining trust funds. Following the audit, Respondent met regularly with Sudler, who reviewed several of Respondent's files selected at random, made suggestions for improvement, and counseled Respondent about his ethical obligations. Sudler testified that Respondent was always receptive to his feedback.
 Around the time that Sudler began monitoring Respondent's practice, Dubon, an undocumented Spanish-speaking immigrant, sought Respondent's assistance. Respondent recalled that Dubon really "needed help" because "she had no clue what was happening." Before she retained Respondent, he coached her, without charge, in how to seek guardianship of her sister's children. She filed pro se a petition for allocation of parental responsibility in Adams County District Court[28] and 
 
 
 503 P.3d 961
 
 
 in January 2018 was given decisionmaking authority for the children.[29] Thereafter, he agreed to represent her in her bid for conservatorship in exchange for 25 percent of the funds he recovered for the children.
 According to Respondent, the Dubon children stood to benefit from two life insurance policies: a Guardian Life Insurance policy and a Colonial Life Insurance policy. When Dubon was granted guardianship, she was permitted to receive funds from Guardian Life Insurance. But, as Respondent recounted, Colonial Life Insurance required that Dubon be appointed conservator of the estate before releasing funds. This task proved difficult because Dubon did not have an established credit history, which was required for her to be appointed a conservator.[30] Respondent remarked that he and his staff spent between 40 and 60 hours on the case in 2018 and early 2019, working to obtain a credit report for Dubon, but their efforts were ultimately unsuccessful. Marisela Mendoza, Respondent's former paralegal, confirmed that CCDC's staff members "did everything [they] could to appoint [Dubon] as conservator." Indeed, she said, everyone in the office "felt for" Dubon, including Respondent, who tried to look out for the children by writing several checks to Dubon from his trust account to cover her sister's funeral expenses and for the children's clothes, transportation, and bedding.[31] 
 By July 2019, Dubon had grown frustrated. Respondent had not been able to arrange for her appointment as the estate's conservator, effectively precluding her from accessing the Colonial Life Insurance funds for the children. She hired other counsel,[32] and Respondent filed with the Adams County court his "Petition to Settle the Estate, Request to Deposit Monies with Court Registry, Request to Approve Counsels’ [sic] Fee's [sic] and Costs and Motion to Withdraw," in which he sought to withdraw from the conservator matter, asked direction from the court as to how to disburse the money he had already received on Dubon's behalf, and requested approval of the fees he earned and the costs he incurred in representing Dubon.[33] He set forth an accounting of the amounts remaining in his trust account, but that accounting contained errors.[34] On August 21, 2019, the court declined to grant the relief that Respondent had requested because his filing lacked cites to legal authority, but it allowed him to file an amended petition.[35] 
 Just a week later, however—on August 27, 2019—the PDJ revoked Respondent's probation in case number 16PDJ057 and activated the remaining seven-month period of his suspension.[36] Respondent's probation revocation, which was unrelated to the Dubon matter,[37] was premised on his violation of several Colorado Rules of Professional Conduct.
 Just a few days thereafter, Respondent stipulated to a three-year suspension in case number 18PDJ063 (which had been consolidated with case number 19PDJ042).[38] That suspension was premised on Respondent's varied misconduct including, among other things, failing to maintain proper financial records, keeping clients’ earned fees in his firm's trust account, commingling his firm's earned money with client money, transferring unearned fees in a client matter from the firm's trust account to the firm's operating account, and failing to return to a client 
 
 
 503 P.3d 962
 
 
 unearned fees.[39] The three-year suspension took effect on September 3, 2019. Respondent is still serving his suspension as of the date of this opinion.
 Around the time of Respondent's suspension, Colorado lawyer Pirzadeh began working at CCDC.[40] She took over Respondent's cases, including the Dubon matter, after he was suspended.[41] According to Respondent, he negotiated in autumn 2019 to sell Pirzadeh certain CCDC assets. He said he also "took his hands off the wheel" in managing the firm's trust accounts in an effort to comply with the requirements of his suspension. Nonetheless, he asked Cullers in December 2019 to "look at the books" with the goal of reconciling and segregating funds in anticipation of Pirzadeh taking over the accounts. Though Cullers found a deficiency in the trust accounts totaling more than $34,000.00, she could not determine the client matters to which the shortage related, as the accounts lacked notations concerning which funds applied to which clients.[42] When Cullers alerted Respondent that the trust account was low, he immediately wrote a check to cover the deficiency.[43] 
 Pirzadeh has submitted all pleadings related to the Dubon matter since December 23, 2019.[44] On December 28, 2019, Pirzadeh filed an "Amended Petition to Settle the Estate and Request for Approval of Counsel's Fees and Costs Pursuant to C.R.P.P. 62."[45] Pirzadeh's amended petition contained some of the same errors as those in Respondent's original petition. On January 14, 2020, the court denied the amended petition for failure to comply with C.R.P.P. 62.[46] Venue for the petition to settle the estate has since been changed to Arapahoe County District Court.[47] In a filing dated May 26, 2021, Pirzadeh represented that the amount being held for the estate before attorney's fees and costs is $16,078.39.[48] That matter is awaiting resolution, though the Arapahoe County court has appointed a guardian ad litem for the children.[49] 
 
 III. SANCTIONS 
 
 The American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards ")[50] and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[51] When imposing a sanction after a finding of lawyer misconduct, the Hearing Board must consider the duty the lawyer violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that the Hearing Board may then adjust based on aggravating and mitigating factors.
 
 ABA Standard 3.0 – Duty, Mental State, and Injury
 
 Duty : Respondent violated duties to his client Dubon, and by extension to the Dubon children, to safeguard and keep separate the Dubon funds. He also violated his duty to maintain adequate records documenting the disposition of those funds.
 
 
 503 P.3d 963
 
 
 Mental State : The People argue that Respondent acted recklessly in handling the Dubon funds because he "deliberately closed his eyes to facts he had a duty to see."[52] Respondent, however, contends that the Hearing Board is bound by the summary judgment order, which found that he "violated Colo. RPC 1.15A(a) by allowing the balance of COLTAF 7169 to fall below the sum he should have held in trust for the Dubon children, resulting in a technical conversion of the Dubon funds."[53] That finding in the order, in turn, was footnoted with a quote from People v. Varallo : "A technical conversion under Colo. RPC 1.15A(a) is a conversion or misappropriation where the lawyer's misappropriation was negligent, or where it cannot be proven by clear and convincing evidence that the lawyer knowingly converted the funds."[54] This language, Respondent says, establishes his state of mind as simple negligence.
 The Hearing Board, however, finds that Respondent acted recklessly when he mismanaged the Dubon funds. While the evidence does not clearly and convincingly show that Respondent was consciously aware of the nature or attendant circumstances of his failure to safeguard the Dubon funds, we readily find that he should have known he was engaged in this misconduct—in other words, we find that he acted with a reckless state of mind when violating Colo. RPC 1.15A(a). And because a reckless finding satisfies a knowing mental state under the ABA Standards , we proceed in our sanctions analysis adopting a knowing state of mind for this rule violation.[55] We separately find that Respondent acted knowingly when he failed to maintain a current recordkeeping system identifying each separate person for whom his firm held funds or other property. Respondent attended the People's trust account school in 2017 and was subject to a trust account audit in early 2018, which apprised him of his fiduciary obligations and should have informed his approach to documenting his trust accounts.
 We reject Respondent's legal contention that the summary judgment order binds us to a finding of negligence with regard to the Colo. RPC 1.15A(a) claim. That rule does not contain a mental state element, leaving to the Hearing Board the mental state determination for the claim.[56] Case law makes this all the more evident, as respondent lawyers have been found to violate Colo. RPC 1.15A with a knowing mental state.[57] In any event, our finding of recklessness here is not inconsistent with Respondent's quoted language from Varallo , which posits two scenarios for technical conversion: (1) a finding of negligent misappropriation and (2) a determination that disciplinary authorities cannot prove knowing conversion by clear and convincing evidence. Although Respondent argues in favor of the first scenario, our finding of recklessness could be said to align with the second.[58] 
 Injury : We find that Respondent's violation of Colo. RPC 1.15A(a) resulted in potential harm. Although Respondent's mismanagement of the Dubon funds did not 
 
 
 503 P.3d 964
 
 
 actually result in a financial loss, his failure to safeguard the funds risked that outcome, which was averted only by his replenishment of CCDC's trust accounts. We also find that Respondent's inadequate recordkeeping resulted in actual harm to the legal system. Because he failed to create or to maintain records documenting his disposition of the Dubon funds—and perhaps the funds of many other clients—neither Cullers nor the People could determine the provenance or the sweep of the $34,000.00 shortfall.
 
 ABA Standards 4.0-8.0 – Presumptive Sanction
 
 Under the ABA Standards , the presumptive sanction for Respondent's misconduct is suspension. ABA Standard 4.12 provides that suspension is generally appropriate when a lawyer knows or should know that the lawyer is dealing improperly with client funds, resulting in injury or potential injury to a client. The presumptive sanction is also set by ABA Standard 7.2, which calls for suspension when a lawyer knowingly engages in conduct that violates a professional duty—here, failing to maintain adequate recordkeeping in violation of Colo. RPC 1.15D —thereby causing injury or potential injury to a client, the public, or the legal system.
 The People argue, however, that this case turns on ABA Standard 8.1(b), which generally provides for disbarment when a lawyer who has been suspended for the same or similar misconduct intentionally or knowingly engages in further similar acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession. The People insist that because some of the misconduct in this case occurred after the September 2019 effective date of discipline in case number 18PDJ063 (consolidated with case number 19PDJ042), Respondent must be disbarred.
 ABA Standard 8.0 is unique among the ABA Standards , as it serves as an additional applicable Standard —a supplement, of sorts, to other presumptive sanctions.[59] Prosecutors do not appear to routinely invoke, nor do courts appear to automatically apply, Standard 8.1(b) when its elements are met.[60] Instead, courts seem to treat application of Standard 8.1(b) as elective and thus consider in their discretion various factors, including the degree to which the lawyer acted willfully,[61] the quantum of injury or potential injury,[62] the level of similarity between past and present offenses,[63] the extent of the lawyer's disciplinary history,[64] and whether the past 
 
 
 503 P.3d 965
 
 
 and current misconduct occurred in the same general timeframe.[65] 
 In our view, Standard 8.1(b) should not control the outcome of this case. Though this is a close call, we find that the Standard ’s elements are only mostly satisfied here and that its application would be draconian. Specifically, we conclude that because Respondent had already violated Colo. RPC 1.15A(a) and Colo. RPC 1.15D before his discipline in case number 18PDJ063 took effect on September 3, 2019, this earlier disciplinary case cannot fairly be considered prior discipline that warrants application of Standard 8.1(b).[66] Respondent's failure to appropriately track the Dubon funds appears to have its beginnings in summer 2018, when he received funds on the family's behalf. His lapses on this front had certainly manifest by July 2019, when the balance of COLTAF 7169 dipped below the $16,078.39 that he should have been safeguarding, and when he made recordkeeping errors in his petition to the court. After July 2019, this pattern persisted: the balance of COLTAF 7169 continued to drop, with no recordkeeping system in place to track the funds’ disposition. At the time of his suspension in case number 18PDJ063 in September 2019, Respondent had already violated these rules; as such, the post-suspension downward slide in the funds that Respondent held in trust, coupled with his continued failure to track those funds, is an ongoing and continuous pattern of mismanagement, rather than a distinct or renewed violation that would warrant application of this presumptive sanction. In this decision, we are also swayed by Respondent's somewhat lesser culpable mental state and the limited injury that his misconduct caused.
 
 ABA Standard 9.0 – Aggravating and Mitigating Factors
 
 Aggravating circumstances include any considerations that justify an increase in the degree of the sanction to be imposed, while mitigating factors warrant a reduction in the severity of the sanction.[67] As explained below, the Hearing Board applies four factors in aggravation, three of which we weigh heavily, and five factors in mitigation, three of which merit limited importance.
 Aggravating Factors 
 Prior Disciplinary Offenses – 9.22(a) : Respondent's prior disciplinary history is extensive, and we accord this factor great weight in aggravation.
 Respondent was publicly censured in 2012 for failing to advise his clients that their interests might be compromised by being called as witnesses against one another. He also neglected to adequately keep track of disbursements made on behalf of one of his clients; this faulty recordkeeping may have resulted in his negligent conversion of those disbursements and of another client's funds.[68] 
 As discussed above, in late 2016, Respondent was suspended from the practice of law for one year, with five months served and seven months stayed upon successful completion of a three-year period of probation with conditions.[69] He was suspended for misconduct stemming from several separate matters, including failing to act competently and diligently; charging an unreasonable fee; revealing 
 
 
 503 P.3d 966
 
 
 information related to the representation of a client; knowingly making a false statement of material fact or law to a court; failing to implement measures to ensure that all firm lawyers complied with the Rules of Professional Conduct; engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; and engaging in conduct prejudicial to the administration of justice.[70] The suspension took effect on February 1, 2017; Respondent was reinstated to the practice of law and began serving his three-year probationary period on October 1, 2017.[71] 
 On July 23, 2019, the PDJ revoked Respondent's three-year probation, vacated the stay on his seven-month suspension, and suspended him for seven months, effective August 27, 2019. The PDJ revoked Respondent's probation on finding that Respondent had violated the terms of his probation by contravening various Rules of Professional Conduct, including failing to act diligently in a client matter; knowingly making a false statement of material fact or law to a tribunal; knowingly disobeying an obligation under the rules of a tribunal; engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; and engaging in conduct prejudicial to the administration of justice.
 Dishonest or Selfish Motive – 9.22(b) : The People press us to apply this aggravating factor, asserting that Respondent was selfish because he allowed the funds in his trust accounts to drop below the amounts he should have held in those accounts; because he failed to set up an appropriate recordkeeping system; and because he failed to heed the lessons of prior disciplinary proceedings by neglecting to change or to improve his practices. We do not see it that way. The People presented no evidence to suggest that Respondent took trust account funds for his own use or mismanaged the Dubon funds for a personal motive. To the contrary, Respondent still has not recouped any fees or costs in this matter. We decline to apply this aggravating factor.
 Pattern of Misconduct – 9.22(c) : This factor is entitled to significant aggravating weight. From 2018 through year's end 2019, Respondent exhibited a pattern of faulty recordkeeping. Further, his trust accounts plummeted far below the minimum amount he should have held for the Dubon children on many occasions between July and December 2019.
 We also consider as a pattern of misconduct Respondent's most recent three-year suspension, which took effect on September 3, 2019. As discussed above, a portion of Respondent's misconduct in this case had already taken place when the discipline in case number 18PDJ063 was levied. For that reason, we view as a pattern of misconduct the three-year suspension that Respondent is now serving.[72] 
 Respondent's three-year suspension was premised on a score of cases in which he engaged in wide-ranging misconduct: he was dishonest by concealing from sheriff's deputies the fact that he was suspended, thereby gaining access to a jail to which he otherwise would have been barred; he engaged in settlement negotiations with opposing counsel and did other legal work in a personal injury matter during his suspension; he failed to maintain proper financial records and thus kept clients’ earned fees in his firm's trust account, commingling his firm's earned money with client money; he wrote four checks to "Cash" from his firm's trust account between 2015 and 2017; he wrote and signed dozens of checks from his firm's operating and trust accounts during his suspension without supervision by a Colorado lawyer in good standing; he disobeyed a court order directing him to participate in the drafting of a proposed case management order and misrepresented to the court why he had not participated in the drafting; in several matters, he did not act with diligence, thereby prejudicing the administration of justice, and failed to keep his clients informed about his 
 
 
 503 P.3d 967
 
 
 billing practices; he charged two clients unreasonable fees; and in one client matter he transferred unearned fees from the firm's trust account to the firm's operating account and failed to return to the client unearned fees.[73] 
 Bad Faith Obstruction of the Disciplinary Proceeding by Intentionally Failing to Comply with Rules or Orders; and Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process – 9.22(e) and 9.22(f) : Though this aggravating factor was heavily contested during the hearing, the parties agree on the following factual predicate:
 The People filed their amended motion for Summary Judgment on April 21, 2021. Respondent's response was due on May 5, 2021. Respondent was scheduled to give his second deposition in this case also on May 5, 2021, at 1:30 p.m. Respondent's counsel sent an email to the People on May 5 at 10:55 a.m., stating: ‘I tried desperately to get the Response to your Summary Judgment Motion done yesterday but I did not succeed. Therefore, I am going to have to finish it up after [Respondent's] depo this afternoon. However, I do not want to sandbag you, so I am attaching the exhibits I will be submitting in support of the Respoinse [sic] in case you want to ask [Respondent] any questions about them in the depo today. I don't even have them all tabbed with an exhibit sticker yet, but I wanted to get them to you.’ One of the exhibits was an affidavit signed and sworn to by [Respondent]. During [Respondent's] deposition on May 5, 2021, [he] testified to the existence of the fifth check, and that it would affect the balance to be held in trust for the Dubon children. [Respondent] amended his affidavit by handwritten interlineation and had his signature notarized at 3:36 p.m. on May 5, 2021. Aside from the amendments by interlineation and the notarization at 3:36 p.m., the contents and form of the amended affidavit were identical to the one that Respondent's counsel had sent to the People shortly before Respondent's deposition on May 5, 2021. The affidavit that had been prepared before the deposition was never submitted to the [PDJ]. It was only the amended affidavit that was filed with the [PDJ] on the evening of May 5, 2021, as Exhibit A to Respondent's summary judgment response.[74] 
 The People argue that this episode epitomizes Respondent's evolving and contradictory responses to their discovery requests and deposition questions, which constitute deceptive tactics and evince his intentional efforts to obstruct this proceeding. Respondent maintains that he has been cooperative throughout the proceeding, and he emphasizes the iterative nature of discovery, noting that he provided information to the People as he gathered it.
 To be sure, the shifting nature of Respondent's discovery responses made the People's prosecution of this case more difficult. But we believe Respondent's belated trickle of discovery responses reflects his shambolic recordkeeping, not an intentional refusal to comply or deliberate chicanery. We roundly and soundly reject the People's argument that these aggravating factors should apply.
 Failure to Recognize Wrongful Nature of Conduct – 9.22(g) : The People argue that Respondent does not appreciate the wrongfulness of his misconduct. We disagree. Respondent credibly testified that he understands he has made mistakes and that he regrets those mistakes. We choose not to apply this factor.
 Vulnerability of Victim – 9.22(h) : Dubon is an undocumented Spanish-speaking immigrant with little to no understanding of American legal processes. Respondent agreed that Dubon is extremely vulnerable. We consider her niece and nephew even more vulnerable. This factor warrants great weight.
 Substantial Experience in the Practice of Law – 9.22(i) : Respondent was licensed as a Colorado lawyer in 2004. Aside 
 
 
 503 P.3d 968
 
 
 from his suspensions, he has been practicing law since that time. This factor is entitled to average weight in aggravation.
 Mitigating Factors 
 Absence of a Dishonest or Selfish Motive – 9.32(b) : We assign some mitigating credit to this factor. After providing Dubon free advice about how to seek appointment as a guardian, Respondent accepted her matter for a reduced fee. Mendoza testified that Respondent felt compassion for Dubon and devoted substantial staff resources to pursuing Dubon's appointment as conservator. Despite this, as of the date of the hearing Respondent has not been recompensed for CCDC's time or the costs it fronted in the Dubon matter.
 Timely Good Faith Effort to Rectify Consequences of Misconduct – 9.32(d) : Respondent is entitled to a modest amount of mitigation for promptly writing a check to cover the approximately $34,000.00 shortfall in CCDC's trust accounts.
 Full and Free Disclosure to Hearing Board or Cooperation with Disciplinary Proceedings – 9.32(e) : Respondent did not exhibit any hostility toward disciplinary authorities, and he credibly testified that he supplemented his discovery responses when he learned or uncovered new information. We give very little mitigating credit to Respondent for this factor.
 Character & Reputation – 9.32(g) : Sudler testified to Respondent's good character, remarking that he had "no doubt" Respondent has been motivated throughout his career to help people. Cullers echoed the sentiment: Respondent's "mission," she said, has been to serve underrepresented populations that cannot afford high-priced lawyers and to employ people in the community who understand his clientele. According to Cullers, Respondent "isn't flashy" or in the law "for the money." He uses his "gift with the law" and cuts costs in his own life to "help people who are struggling." Finally, Mendoza opined that Respondent is a compassionate person who did everything he could do help the Dubon children. We find that this factor merits more than average mitigating weight.
 Remorse – 9.32(l) : Because Respondent expressed some modicum of genuine contrition for his failure to appropriately manage and track funds, we assign this factor limited mitigating credit.
 
 Analysis Under ABA Standards and Case Law
 
 The Hearing Board heeds the Colorado Supreme Court's directive to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors, mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[75] Though prior cases can inform through analogy, the Hearing Board is charged with determining the appropriate sanction for Respondent's misconduct based on the specific facts of this case.
 As discussed above, the presumptive sanction under the ABA Standards in this case is suspension. Case law also calls for suspension,[76] the length of which depends on the presence of aggravating and mitigating factors.[77] While the mitigating and aggravating factors here are in rough balance numerically, the strong weight we assign to Respondent's prior discipline and his pattern of misconduct—despite the many educational opportunities available to him—as well as the Dubons’ status as extremely vulnerable victims, militate for an extended period of suspension. We thus conclude that Respondent should be suspended for two years, to run concurrent with his three-year suspension in case number 18PDJ063.[78] Indeed, we are 
 
 
 503 P.3d 969
 
 
 convinced protection of the public demands a sanction that carries with it the requirement that Respondent petition for reinstatement under C.R.C.P. 242.39. In particular, that petitioning process must require him to demonstrate he has been rehabilitated such that a future hearing board can be adequately assured his financial mismanagement will never reoccur. It must also include proof that he is fit to practice ethically, which he must show by achieving a passing score on the multistate professional responsibility ethics examination.[79] 
 
 IV. CONCLUSION 
 
 Respondent's continued mismanagement of trust account funds imperiled his clients’ property and rendered it all but impossible for an accountant and Colorado disciplinary authorities to trace what became of more than $34,000.00 that he should have held in trust. This pattern of misconduct, coupled with his disciplinary history, warrants a meaningful period of suspension that requires, in particular, proof of rehabilitation and fitness to practice ethically. The condign sanction here is a suspension of two years.
 
 V. ORDER 
 
 The Hearing Board therefore ORDERS :
 1. DOUGLAS LEO ROMERO , attorney registration number 35464 , is SUSPENDED from the practice of law for a period of TWO YEARS , to run concurrent with the period of suspension he is currently serving in case number 18PDJ063. The suspension in this case will take effect upon issuance of an "Order and Notice of Suspension."[80] 2. As part of any petition for reinstatement under C.R.C.P. 242.39 from the suspension imposed in this case, Respondent MUST prove that he has achieved, no more than one year before petitioning for reinstatement, a passing score on the multistate professional responsibility ethics examination.
3. To the extent applicable, Respondent SHALL promptly comply with C.R.C.P. 251.28(a)-(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.
4. Within fourteen days of issuance of the "Order and Notice of Suspension," Respondent SHALL comply with C.R.C.P. 251.28(d), requiring an attorney to file an affidavit with the PDJ setting forth pending matters and attesting, inter alia, to notification of clients and other state and federal jurisdictions where the attorney is licensed.
5. The parties MUST file any posthearing motions on or before Tuesday, December 7, 2021 . Any response thereto MUST be filed within seven days.
6. The parties MUST file any application for stay pending appeal on or before Tuesday, December 14, 2021 . Any response thereto MUST be filed within seven days.
7. Respondent SHALL pay the costs of this proceeding. The People SHALL file a statement of costs on or before Tuesday, December 7, 2021 . Any response thereto MUST be filed within seven days.
 
 --------
 Notes:
 [1] Amended to correct a typographical error in the discussion of the presumptive sanction.
 [2] See also Stip. Facts ¶ 2.
 [3] Respondent understood at the time that he was permitted to have more than one COLTAF account, and the People do not claim that a lawyer cannot have more than one trust account.
 [4] See also Stip. Facts ¶ 9.
 [5] See also Stip. Facts ¶¶ 3, 8.
 [6] See also Stip. Facts ¶ 4.
 [7] See also Stip. Facts ¶ 7.
 [8] See also Stip. Facts ¶ 10.
 [9] See also Stip. Facts ¶ 11.
 [10] "Order Granting Complainant's Motion for Partial Summary Judgment" (Aug. 27, 2021) at 3; see also Stip. Facts ¶ 12.
 [11] See also Stip. Facts ¶ 13; Ex. S3.
 [12] "Order Granting Complainant's Motion for Partial Summary Judgment" at 4; Ex. S3.
 [13] See "Order Granting Complainant's Motion for Partial Summary Judgment" at 4 n.33.
 [14] While the People admit that this is the lowest combined balance during those months in the two COLTAF accounts, they affirmatively state that the combined balances in general were far less than what should have been held in trust for all of Respondent's clients.
 [15] See also Stip. Facts ¶ 16.
 [16] See also Stip. Facts ¶ 15.
 [17] "Order Granting Complainant's Motion for Partial Summary Judgment" at 7.
 [18] See also Stip. Facts ¶ 19.
 [19] See also Stip. Facts ¶ 20.
 [20] These checks were written to Dubon for various costs and settlement of the estate.
 [21] It appears that a fifth check was written to Dubon from COLTAF 7169 for $1,000.00, bringing the total funds paid to her to $8,258.13. This check was omitted from Respondent's financial statement filed with the court in July 2019.
 [22] Respondent acknowledges that the amount of check number 1211 was incorrectly listed in the financial statement as $2,540.20 rather than $2,258.13.
 [23] "Order Granting Complainant's Motion for Partial Summary Judgment" at 8.
 [24] "Order Granting Complainant's Motion for Partial Summary Judgment" at 9.
 [25] For instance, on July 19, 2019, the balance was $8,844.96; on July 24, the balance was $8,837.17; on July 25, the balance was $6,837.17; on July 26, the balance was $4,834.67; and on July 31, the balance was $9,822.17.
 [26] Ex. S1 at 510-11, 521-22 (case number 16PDJ057).
 [27] Ex. S1 at 511. Respondent attended the People's trust account school in April 2017. Stip. Facts ¶ 15.
 [28] Stip. Facts ¶ 5.
 [29] Stip. Facts ¶ 6.
 [30] See Ex. S2 at 376.
 [31] Mendoza confirmed that at least up through October 2019, when she left CCDC, Respondent was solely responsible for trust account decisionmaking.
 [32] Dubon's new counsel apparently never entered an appearance in the case.
 [33] Ex. S2.
 [34] Ex. S3.
 [35] Stip. Facts ¶ 14; Ex. S4.
 [36] Stip. Facts ¶ 15.
 [37] Stip. Facts ¶ 15.
 [38] The People filed the complaint in case number 18PDJ063 on October 12, 2018, claiming, among other things, that Respondent had violated Colo. RPC 1.15A(a) and Colo. RPC 1.15D. Stip. Facts ¶ 17. The People filed a first amended complaint on October 24, 2018, and a second amended complaint on April 5, 2019, both of which contained the same claims. Stip. Facts ¶ 17; Ex. S1 at 472-484.
 [39] Ex. S1 at 463-71.
 [40] Stip. Facts ¶ 18.
 [41] Stip. Facts ¶ 18.
 [42] Cullers testified that her point of contact concerning the trust accounts’ deficiency in December 2019 was Respondent, because he was "responsible" for those accounts.
 [43] Stip. Facts ¶ 20. Respondent alternately claimed that he wrote the check from his personal funds and from CCDC's operating account, which he said he considered his personal funds. The Hearing Board need not resolve this factual discrepancy, which is immaterial to our task of determining the appropriate sanction in this matter.
 [44] Stip. Facts ¶ 24.
 [45] Stip. Facts ¶ 21; Ex. S5.
 [46] Stip. Facts ¶ 22; Ex. S6.
 [47] Stip. Facts ¶ 23.
 [48] Stip. Facts ¶ 24.
 [49] Stip. Facts ¶¶ 24-25.
 [50] Found in ABA Annotated Standards for Imposing Lawyer Sanctions (2d ed. 2019).
 [51] See In re Roose, 69 P.3d 43, 46-47 (Colo. 2003).
 [52] People v. Rader , 822 P.2d 950, 953 (Colo. 1992).
 [53] "Order Granting Complainant's Motion for Partial Summary Judgment" at 9.
 [54] "Order Granting Complainant's Motion for Partial Summary Judgment" at 9 n.62 (citing People v. Varallo , 913 P.2d 1, 11 (Colo. 1996) ).
 [55] See Colo. RPC 1.0 cmt. 7A ("[f]or purposes of applying the ABA Standards for Imposing Lawyer Sanctions ... the Court will continue to apply the Egbune line of cases [i.e., considering a reckless state of mind, constituting scienter, as equivalent to "knowing"]); see also In re Egbune , 971 P.2d 1065, 1069 (Colo. 1999).
 [56] See In re Attorney F. , 2012 CO 57, ¶ 19, 285 P.3d 322 (emphasizing a hearing board's discretion in fashioning a sanction, which requires findings and analysis of the duties violated, the lawyer's mental state, and the injury resulting from the misconduct); cf . Colo. RPC 1.0 cmt. 7A (establishing a mental state only for violations of the Colorado Rules of Professional Conduct that specifically require the mental state of knowledge).
 [57] See, e.g., In re Kleinsmith , 2017 CO 101, ¶ 39, 409 P.3d 305 ; People v. Waters , 438 P.3d 753, 763 (Colo. O.P.D.J. 2019).
 [58] See Colo. RPC 1.0 cmt. 7A (noting that a reckless state of mind is generally equivalent to knowing, with the one important exception of knowing conversion of property).
 [59] See In re Steiner , 817 A.2d 793, 797 (Del. 2003) (describing ABA Standard 8.o as applying "enhanced sanctions" for lawyers who "present[ ] such a serious risk as to warrant special consideration").
 [60] For example, the Colorado Supreme Court has just once explicitly applied Standard 8.1(b), in People v. Bottinelli, 926 P.2d 553 (Colo. 1996).
 [61] See In re Gershater , 263 Kan. 199, 946 P.2d 993, 997 (1997) (publicly censuring lawyer for conduct deemed to be the result of oversight, where the lawyer's actions were not intentional, and she lacked a dishonest motive to commit misconduct).
 [62] See Hoover v. Bd. of Prof'l Responsibility , 395 S.W.3d 95, 107 (Tenn. 2012) (citing ABA Standard 8.1(b) and emphasizing the substantial harm the lawyer caused clients); Maddux v. Bd. of Prof'l Responsibility , 409 S.W.3d 613, 628 (Tenn. 2013) (mentioning ABA Standard 8.1(b) but declining to apply it, focusing on the potential injury to the client, and imposing suspension).
 [63] See Annotated Standards for Imposing Lawyer Sanctions at 415 ("When past and present offenses are identical or strikingly similar, courts are more likely to find baseline disbarment is warranted under Standard 8.1(b)."); Bottinelli, 926 P.2d at 558 (disbarring a lawyer who made false accusations of conspiracy against judges and lawyers less than three months after the lawyer's reinstatement from a six-month suspension for "striking[ly]" similar misconduct).
 [64] See Annotated Standards for Imposing Lawyer Sanctions at 416; In re C de Baca , 11 P.3d 426, 432 (Colo. 2000) (omitting mention of ABA Standard 8.1(b) but finding that a lawyer's prior discipline, which included admonishments, public censures, and two suspensions, despite opportunities to rehabilitate, militated in favor of disbarring the lawyer); People v. Dolan , 873 P.2d 766, 769 (Colo. 1994) (omitting mention of ABA Standard 8.1(b) but nonetheless disbarring a lawyer who had an extensive history of discipline for similar misconduct, including two prior orders of suspension and several private sanctions, and remarking on "the futility of imposing still another period of suspension"); see also In re Skagen , 367 Or. 236, 476 P.3d 942, 953 (2020) (citing ABA Standard 8.1(b) with approval and disbarring a lawyer for behavior similar to the prior misconduct for which he was earlier disciplined).
 [65] See Annotated Standards for Imposing Lawyer Sanctions at 419 (noting that timing considerations may arise in the context of identifying baseline sanctions and applicable aggravation); People v. Van Buskirk , 981 P.2d 607, 608-09 (Colo. 1999) (declining to disbar a lawyer under Standard 8.1(b) because all of the acts addressed in the current case had occurred before imposition of the discipline in the earlier case); People v. Regan , 871 P.2d 1184, 1188 (Colo. 1994) (imposing suspension, rather than disbarment, when a lawyer committed similar misconduct during the same time period as his past misconduct, and treating the first disciplinary case as an instance of a pattern of misconduct, not as prior discipline).
 [66] Accord Van Buskirk , 981 P.2d at 609 (noting that the date the earlier discipline was imposed determined whether to consider the earlier case as prior discipline or a pattern of misconduct); Regan , 871 P.2d at 1188 ("Had the respondent engaged in the instant misconduct after being disciplined in 1992 , there would be no question that disbarment would be appropriate.") (emphasis added).
 [67] See ABA Standards 9.21 and 9.31.
 [68] Ex. S1 at 561-91.
 [69] Ex. S1 at 510-12.
 [70] Ex. S1 at 513-57.
 [71] Ex. S1 at 592-93. Respondent attended the People's trust account school in April 2017. Stip. Facts ¶ 15.
 [72] The beginning of Respondent's period of three-year suspension ran concurrent to his seven-month suspension that resulted from the revocation of his probation in case number 16PDJ057.
 [73] Ex. S1 at 463-71.
 [74] Stip. Facts ¶ 26. See also Ex. S11 (interlineated affidavit).
 [75] Attorney F. ,¶ 20 (quoting In re Rosen , 198 P.3d 116, 121 (Colo. 2008) ).
 [76] See Varallo , 913 P.2d at 11 ; People v. Wechsler , 854 P.2d 217, 222-23 (Colo. 1993) (finding that suspension is appropriate when conversion is neither intentional nor willful); People v. McGrath , 780 P.2d 492, 493 (Colo. 1989) (noting that suspension, at the least, is appropriate when a lawyer should know that the lawyer is dealing improperly with client property).
 [77] People v. Galindo , 884 P.2d 1109, 1112 (Colo. 1994)
 [78] As a result, the two periods of suspension will overlap in some measure, although the suspension in this case will last for more than a year after the end of Respondent's three-year suspension in case number 18PDJ063. To be reinstated, Respondent will have to prove his rehabilitation from the underlying misconduct in this case and in case number 18PDJ063.
 [79] The Hearing Board urges, but does not mandate, Respondent to also prove his fitness to practice by seeking educational instruction or mentorship in competently practicing probate law.
 [80] In general, an order and notice of sanction will issue thirty-five days after a decision is entered under C.R.C.P. 251.19(b). In some instances, the order and notice may issue later than the thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.
 --------